## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Christina Boudreau,

      Plaintiff,

    v.

Expeditors International of
Washington, Inc.

      Defendant.

No.  1:25-cv-10300

## COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

1.    Plaintiff, Christina Boudreau ("**Plaintiff**" or "**Ms. Boudreau**"), brings this action against Expeditors International of Washington, Inc. ("**Expeditors**" or "**Defendant**") for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, wrongful termination in violation of public policy, breach of her at-will employment contract (in the alternative), and violation of M.G.L. ch. 149, §52C. Plaintiff alleges that Defendant failed to follow its own Code of Business Conduct ("**Code**"), subjected her to unfair and retaliatory treatment, violated

1

statutory requirements governing personnel records, and constructively discharged her after approximately eleven years of exemplary service.

2.  Ms. Boudreau consistently performed at a high level over her tenure with Expeditors, earning multiple industry certifications (including a customs broker license) and often volunteering for additional duties. Despite her commitment, Expeditors subjected her to unethical practices, favoritism, and retaliatory conduct, culminating in her forced resignation on or about July 24, 2024.

3.  A central instance of Expeditors' misconduct involved its requirement that Ms. Boudreau complete compliance trainings for the Regional Vice President in responsible for her branch, Mr. Brian Carrabes, who frequently neglected his responsibilities. With District Manager Tracy Peveri facilitating and encouraging this improper arrangement, Ms. Boudreau carried out approximately sixty training courses for Mr. Carrabes, most recently performing them on December 29, 2023, despite company policy prohibiting such behavior. No disciplinary action was taken against

Mr. Carrabes or Ms. Peveri, leaving Ms. Boudreau feeling complicit under pressure.

4.     Ms. Boudreau also witnessed and endured ongoing favoritism toward coworkers with personal ties to senior management. She was consistently denied fair opportunities, including promotions that were either not posted or deliberately manipulated to favor close associates of Ms. Peveri, such as Jenna Connors and Nancy Bowie.

5.     Ms. Boudreau repeatedly raised concerns about these unethical practices. Instead of conducting good-faith investigations, Expeditors' management retaliated by obstructing her career advancement and subjecting her to unwarranted discipline. Ultimately, Ms. Boudreau could not continue in such a toxic work environment and was forced to resign.

6.     As a direct result of Defendant's unlawful conduct, Ms. Boudreau has suffered substantial damages, including but not limited to lost wages, emotional distress, reputational harm, and other compensable injuries. She brings this action seeking all appropriate legal and equitable remedies.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between the parties.

8.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in Massachusetts, where Plaintiff worked for Expeditors.

## PARTIES

9.      Plaintiff Christina Boudreau is an individual residing in Reading, Massachusetts. She worked for Expeditors for approximately eleven years, until on or about July 24, 2024, when she was constructively dischaged due to pervasive favoritism and retaliation.

10.     Defendant Expeditors International of Washington, Inc. is a Washington corporation with a principal place of business at 1015 Third Avenue, Seattle, Washington. It conducts business throughout the

United States, including in Massachusetts, and maintains a Boston-area office where Ms. Boudreau was employed.

**FACTS**

11.    Upon her initial hiring in or around 2013, and as a continuing condition of employment, Ms. Boudreau was required to review, acknowledge, and annually recertify her compliance with Expeditors' Code of Business Conduct ("**Code**"). The Code is a written document explicitly applicable to "[every] employee, director, and officer" of Expeditors worldwide.

12.    The Code functions as more than a mere internal policy; it operates as a set of binding obligations between Expeditors and its employees, emphasizing that "honesty and integrity" are fundamental requirements of employment. The Code mandates that employees abide by its provisions and that all managers, up to the most senior levels, consistently enforce them without exception.

13.    No disclaimers within the version(s) of the Code provided to Ms. Boudreau disavowed its binding

nature. In fact, Expeditors has, in prior litigation, taken the position that the Code is legally binding. In at least one federal court proceeding, Expeditors described the Code as functioning as the "constitution" of the company, illustrating its importance and enforceability.

14.    The Code affirmatively states that all employees must adhere to "fundamental values" of honesty, loyalty, fairness, objectivity, and respect in dealing with co-workers, customers, and the company itself. It further prohibits retaliation, conflict of interest, favoritism, password sharing, falsification of records, and any form of intentional misrepresentation in connection with company compliance programs.

15.    The Code places reciprocal obligations on Expeditors as an employer, pledging that employees will not be disciplined or terminated for raising good-faith concerns of Code violations, providing that serious issues of unethical conduct be fully investigated before disciplinary measures occur, and requiring that records be maintained accurately without material omissions or falsifications, with management refraining from pressuring employees to

violate these standards.

16.     Ms. Boudreau reasonably understood and relied on
        the Code as a binding promise by Expeditors that
        it would investigate and address complaints of
        unethical or retaliatory behavior, refrain from
        punitive actions for raising these complaints, and
        ensure that any discipline or adverse employment
        action would be based on fair and accurate
        investigations and documentation.

17.     Because Expeditors' Code incorporated consistent
        training, mandatory annual acknowledgments, and
        explicit language that violations could result in
        termination, Ms. Boudreau believed that adhering
        to the Code's terms constituted an essential and
        enforced term of her employment. Had she known
        Expeditors would not honor these obligations, she
        would not have continued her employment or would
        have taken steps to protect her career and legal
        rights sooner.

18.     As set forth below, Expeditors' conduct,
        particularly in disregarding Ms. Boudreau's
        complaints about favoritism, compelling her to
        complete illicit compliance trainings for her

supervisor, and omitting accurate information from her personnel file, constituted a breach of the Code and, consequently, a breach of the implied contractual agreement between Expeditors and Ms. Boudreau.

## **Ms. Boudreau's Employment and Exemplary Performance**

19.   Over Ms. Boudreau's eleven-year tenure with Expeditors, she acquired multiple certifications, including a customs broker license and other industry qualifications, and steadily took on more responsibilities.

20.   By 2023 and into early 2024, Ms. Boudreau was regarded as a strong resource for the company, often stepping in to help with tasks beyond her official job description. Despite her diligence and successes, Expeditors not only failed to reward her contributions but also denied her equitable treatment in promotions and compensation.

## <u>Unethical Practice of Completing Supervisor's Compliance Trainings</u>

21.    From the outset, Ms. Boudreau noticed that her Regional Vice President, Mr. Brian Carrabes, was frequently absent or neglecting required compliance trainings that the company mandated for all employees. These trainings are typically recorded in the Professional Development Center ("**PDC**") system, which tracks IP addresses and requires unique user logins, including a single sign-on that uses an individual's full computer password. The company employs access cards for building entry, enabling them to generate reports on when Mr. Carrabes was present in the building.

22.    District Manager Tracy Peveri explicitly encouraged Ms. Boudreau to "help" Mr. Carrabes by completing his trainings on his behalf in order for their district to meet compliance deadlines. Ms. Boudreau felt pressured to comply because Ms. Peveri implied that failing to do so would reflect poorly on their district's performance and would negatively affect her performance ratings.

23.     The last instance of such wrongdoing occurred on December 29, 2023, when Ms. Boudreau completed approximately nineteen PDC compliance trainings for Mr. Carrabes. Because the system logs the IP address and requires a full password, Expeditors could easily determine that Mr. Carrabes had not completed them himself. Despite this blatant violation of policy, Expeditors took no action.

24.     Ms. Boudreau found this conduct unethical and contrary to Expeditors' own policies, which forbid employees from sharing passwords, falsifying training records, or assisting others in circumventing compliance requirements. Yet, when she voiced her concerns, management (including Ms. Peveri) dismissed them.

## Favoritism Toward Certain Employees

25.     Ms. Boudreau repeatedly encountered overt favoritism by Ms. Peveri, who extended preferential treatment to her close friends—notably, Ms. Jenna Connors and Ms. Nancy Bowie. These individuals were granted promotions, allowances (e.g., a car allowance for Ms. Connors, though she did not

travel), and opportunities for advancement that were never openly posted.

26.     For instance, Ms. Connors had previously worked part-time yet received full-time pay, was given a car allowance intended for traveling sales staff though she did not travel, and was promoted to Mr. Carrabes' team without the position being advertised. Similarly, Ms. Bowie, who lacked relevant qualifications or extensive experience, was personally mentored and advanced by Ms. Peveri.

27.     In September 2023, Ms. Boudreau applied for a sales operations position (previously held by Ms. Connors) that aligned well with her skill set and experience. She was indisputably the most qualified internal applicant, holding a customs broker license and multiple additional industry certifications. Nevertheless, her application was ignored for nearly a month, and when Ms. Bowie instructed Ms. Boudreau to post the position externally, it became clear that management intended to exclude her from consideration.

28.    Ultimately, the job was awarded to a less
       experienced candidate with only two years at
       Expeditors, no certifications, and minimal industry
       background. The entire hiring process was
       manipulated to Ms. Boudreau's detriment and
       reflected the ongoing favoritism and unethical
       practices.

### Retaliation, Constructive Discharge

29.    After raising concerns about these unethical
       practices (including the forced compliance-
       trainings scheme for Mr. Carrabes), Ms. Boudreau was
       subjected to unwarranted scrutiny and was
       reprimanded for minor infractions such as
       occasional lateness. In contrast, her supervisors
       engaged in far more egregious misconduct (e.g.,
       extended unannounced absences) without
       consequence.

30.    After her resignation, Ms. Boudreau formally raised
       her complaints with higher-level leadership,
       including Dan Wall, President of Global Geographies
       at Expeditors, who promised a serious review. Yet
       no tangible outcome materialized, leaving

Ms. Boudreau with the strong impression that Expeditors' leadership had no intention of addressing her valid concerns.

### Dan Wall's "Mike Hawk" Meme

31.     The lack of professionalism at senior tiers of Expeditors was further highlighted when Ms. Boudreau discovered that Mr. Wall publicly posted a vulgar meme on his Twitter account referencing "Mike Hawk" (plainly read as "My Cock"). The posting remained publicly visible. Ms. Boudreau found it deeply inappropriate and further evidence of a leadership culture that disregarded the Code's supposed values of decorum and respect.

32.     The posting of such a meme not only undermined Ms. Boudreau's belief that her concerns regarding the matter would be treated with the seriousness they deserved but also appeared to directly violate the Code, as the meme could be considered, among other things, vulgar and misogynistic.

33.     Despite repeated requests from the Plaintiff's
        solicitor to Expeditors' legal team, Mr. Wall did
        not remove the offensive post, exacerbating the
        situation and demonstrating a lack of
        accountability and responsiveness from senior
        management.

34.     Below is the Mike Hawk meme posted by Dan Wall,
        which included his commentary "Classic!":



**Covert Termination Program**

35.     In   2023,   Expeditors   implemented   a   covert
        termination  program  designed  to  reduce  its
        workforce without publicly acknowledging layoffs.
        This  program  involved  creating  a  hostile  work
        environment,  fabricating  performance  issues,  and
        pressuring  employees  to  resign  voluntarily.  The
        program  was  designed  to  circumvent  Expeditors'
        publicly  touted  no-layoff  policy  and  avoid  the
        legal  and  financial  obligations  associated  with
        formal layoffs.

36.     As  part  of  this  program,  Expeditors  targeted
        employees  who  raised  concerns  about  unethical
        practices,  such  as  Ms.  Boudreau,  as  their  continued
        employment  posed  a  risk  to  the  company's  ability
        to maintain the façade of a no-layoff policy. Ms.
        Boudreau's  complaints  about  favoritism,  unethical
        practice  (such  as  being  forced  to  complete  her
        supervisor's     compliance     trainings),     and
        retaliation made her a prime target for the covert
        termination program.

37.     The   covert   termination   program   created   an
        environment  where  employees  were  subjected  to

unwarranted scrutiny, unfair disciplinary actions,
and a toxic work culture, all of which were designed
to pressure them into resigning.

38.    The covert termination program further exacerbated
the retaliatory and discriminatory practice Ms.
Boudreau experienced. For example, after she raised
concerns about favortism and unethical behavior,
she was subjected to increased scrutiny, denied
promotions, and ultimately forced to resign. These
actions were consistent with the broader goals of
the covert termination program, which sought to
eliminate employees who could expose the company's
unethical practices or who were seen as less
favorable due to personal biases or favortism.

39.    The covert termination program was not an isolated
initiative but was instead tied to the broader
culture of favortism, retaliation, and unethical
behavior that Ms. Boudreau experienced. By
targeting employes who raised concerns or who did
not align with the personal preferences of senior
management, Expeditors was able to reduce its
workforce while maintaining the appearance of a no-
layoff policy. This program directly contributed
to the hostile work environment that forced Ms.

16

Bourdreau to resign.

## Inaccurate Personnel Records

40.    Despite repeatedly raising concerns regarding unethical practices, favoritism, and forced compliance trainings, Ms. Boudreau's personnel file contains no written acknowledgment of these issues or of any investigation conducted by Expeditors. By failing to note even a single record of her complaints or their outcomes, the file misleadingly suggests that no such complaints were ever made.

41.    The personnel file further mischaracterizes Ms. Boudreau's departure from Expeditors. Various PAF (Personnel Action Form) documents classify her separation as a routine voluntary resignation, omitting the fact that Ms. Boudreau was effectively pushed to resign due to persistent retaliation, favoritism, and a toxic workplace culture. This omission skews the file in a way that inaccurately suggests her termination was wholly voluntary when in fact it was a result of constructive discharge.

42.    The personnel file depicts Ms. Boudreau as simply having met or exceeded standard performance

expectations with uninterrupted operations duties. However, it does not document the significant additional burden imposed on Ms. Boudreau when she was compelled to complete her supervisor's own compliance trainings—something she specifically reported to certain managers. By excluding any record of this forced labor, the file masks the unethical nature of Expeditors' actions, leaving a false impression that Ms. Boudreau never raised or experienced any problem relating to compliance functions.

43.    Finally, Ms. Boudreau's personnel file contains no mention of the retaliation-based performance criticisms she received shortly after reporting favoritism in the office, even though the file does include several performance evaluations. By documenting only standard or positive reviews and leaving out management's sudden unwarranted scrutiny, the file disguises the retaliatory motive behind Ms. Boudreau's negative treatment and departure.

44.    Following her resignation, Ms. Boudreau sought to review her personnel records. She discovered that Expeditors had either failed to disclose certain

18

entries or refused to correct material she believed was misleading or inaccurate, in violation of M.G.L. ch. 149, § 52C. Without timely notice or the opportunity to respond, these undisclosed or uncorrected records contributed to Expeditors' retaliatory trajectory.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Breach of Contract)

45.    Plaintiff realleges and incorporates all preceding paragraphs.

46.    Expeditors' Code of Business Conduct, along with associated policies and repeated assurances, constituted an express or implied contract under Massachusetts law. Ms. Boudreau performed under that contract by abiding with the Code's rules and continuing her employment.

47.    By failing to investigate Ms. Boudreau's legitimate complaints, tolerating or encouraging unethical practices, requiring Ms. Boudreau to perform Mr. Carrabes' training, implementing a covert termination program designed to pressure employees

to resign, and retaliating against Ms. Boudreau, Expeditors materially breached its obligations under the Code and related policies.

48.     As a direct and proximate result, Ms. Boudreau has suffered damages including but not limited to lost wages, lost benefits, reputational harm, and emotional distress.

## SECOND CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

49.     Plaintiff realleges and incorporates all preceding paragraphs.

50.     Under Massachusetts law, every contract contains an implied covenant of good faith and fair dealing. Expeditors breached that covenant by unduly pressuring Ms. Boudreau to undertake unethical tasks (completing her supervisor's trainings), ignoring her complaints, and retaliating when she raised concerns, thereby depriving her of the full benefits of her employment.

51.    As a result, Ms. Boudreau was effectively driven
       from her job, causing substantial economic and non-
       economic harm.

### THIRD CAUSE OF ACTION
### (Wrongful Termination)

52.    Plaintiff realleges and incorporates all preceding
       paragraphs.

53.    Even assuming Ms. Boudreau was employed at will,
       Massachusetts law bars discharging an employee when
       doing so contravenes clearly established public
       policy, including retaliating against an employee
       for objecting to unethical or illegal activities.

54.    Ms. Boudreau reported unethical conduct, namely,
       coerced falsification of compliance records,
       personnel records and favoritism. Rather than
       correct these violations, Expeditors isolated and
       penalized her, culminating in her forced
       resignation.

55.    Accordingly, Ms. Boudreau's constructive discharge
       was a wrongful termination violating Massachusetts
       public policy, directly causing her lost wages,
       emotional distress, and associated damages.

### FOURTH CAUSE OF ACTION
### (Promissory Estoppel (in the Alternative))

56.    Plaintiff realleges and incorporates all preceding
       paragraphs.

57.    Even if no valid contract existed, Expeditors made
       clear promises to maintain a fair, ethical
       workplace, to investigate wrongdoing, and not to
       retaliate against employees raising legitimate
       concerns. Expeditors also publicly touted a no-
       layoff policy. Ms. Boudreau reasonably relied on
       these promises by performing her job, assisting in
       compliance tasks, and reporting misconduct.

58.    In reneging on these promises—failing to intervene,
       investigating only superficially (if at all), and
       retaliating, Expeditors caused Ms. Boudreau to
       suffer lost earnings and other damages. Enforcing
       these promises or awarding damages is necessary to
       prevent injustice.

## FIFTH CAUSE OF ACTION
## (Breach of At-Will Employment (in the Alternative)

59.    Plaintiff realleges and incorporates all preceding paragraphs.

60.    If Ms. Boudreau is determined to have been an at-will employee, Expeditors nonetheless acted in bad faith, subjecting her to unethical demands, implementing a covert termination program designed to pressure employees to resign, and retaliating against her for raising concerns, thereby violating Massachusetts public policy and contravening the implied obligations, including the implied covenant of good faith and fair dealing, associated with at-will employment.

61.    Ms. Boudreau was effectively terminated through constructive discharge, suffering substantial losses warranting relief.

**SIXTH CAUSE OF ACTION**
**(Violation of M.G.L. ch. 149, § 52C)**

62.     Plaintiff realleges and incorporates all preceding
        paragraphs.


63.     M.G.L. ch. 149, § 52C requires employers to maintain
        accurate personnel records and to allow employees
        to review and dispute any unfavorable or inaccurate
        material in their personnel files. Employers must
        also provide timely notice when such materials are
        placed in the file.


64.     Expeditors violated § 52C by withholding or failing
        to correct inaccurate or adverse information in
        Ms. Boudreau's personnel file and by not giving her
        a meaningful opportunity to resolve or dispute
        these entries.


65.     These statutory violations further damaged
        Ms. Boudreau's ability to defend her work record
        and contributed to the hostile environment that
        ultimately forced her resignation.

**PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiff, Christina Boudreau, respectfully requests that this Court:

a. Award compensatory damages for all economic losses, including lost pay and benefits in an amount to be determined at trial;

b. Award non-economic damages for emotional distress, humiliation and harm to reputation;

c. Declare that Defendant's conduct violated M.G.L. ch. 149, § 52C, and order Expeditors to correct or amend Ms. Boudreau's personnel file as required by law;

d. Award all other damages to which the Plaintiff is entitled to, along with pre-judgment and post-judgment interest and costs; and

e. Grant such additional or alternative relief as the Court deems just and proper.

**The Plaintiff demands a trial by jury on all issues.**

Christina Boudreau, Plaintiff
By her attorney,

_____

Adam Clermont
6 Liberty Square
PMB 226
Boston, MA 02109
Tel: (413) 841-1270(Massachusetts)
Tel: +852 9086 3191(Hong Kong)
E-mail: aclermont@attorneyapc.com
BBO No.: 639769